## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

---

|  |  |  |
|---|---|---|
| KATHERINE SULLIVAN, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | Case No. 1:24-cv-00172-MJM |
| | ) | |
| *v.* | ) | |
| | ) | |
| MICHAEL G. SUMMERS, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

---

## [PROPOSED] BRIEF OF *AMICUS CURIAE* JUDICIAL WATCH, INC. <u>IN SUPPORT OF PLAINTIFFS</u>

**TABLE OF CONTENTS**

**Page No.**

IDENTITY AND INTERESTS OF *AMICUS CURIAE* ...................................................................1

SUMMARY OF ARGUMENT ........................................................................................................3

ARGUMENT ...................................................................................................................................5

I.      Voter History is Vital to Determining an Accurate and Current Voter List.......................5

II.     Voting History is a "Record" Concerning the Accuracy of the Official List
        of Voters and Subject to Disclosure Under the NVRA .......................................................7

III.    Defendants' Investigatory Restrictions on the Use of Voter is Superseded
        and Preempted by the NVRA's Public Disclosure Provision...............................................9

CONCLUSION..............................................................................................................................12

## **TABLE OF AUTHORITIES**

**Cases**                                                                                               **Page No.**

*ACORN v. Edgar*, 56 F.3d 791 (7th Cir. 1995)..............................................................................11

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n.*, 576 U.S. 787 (2015)...................10

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013) .......................................9, 10, 11

*Bloomberg L.P. v. United States FDA*, 500 F. Supp. 2d 371 (S.D.N.Y. 2007) ..............................8

*Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008) ........................................................3

*Ex parte Siebold*, 100 U.S. 371 (1880) ........................................................................................10

*Foster v. Love*, 522 U.S. 67 (1997)...............................................................................................10

*Harkless v. Brunner*, 545 F.3d 445 (6th Cir. 2008) ......................................................................10

*Husted v. A. Philip Randolph Inst.*, 584 U.S. 756 (2018).......................................................5, 6, 9

*Illinois Conservative Union v. Illinois*,
   2021 U.S. Dist. LEXIS 102543 (N.D. Ill. June 1, 2021) .........................................................2

*Judicial Watch, Inc. v. Griswold*, 554 F. Supp. 3d 1091 (D. Colo. 2021).....................................6

*Judicial Watch v. Lamone*, 399 F. Supp. 3d 425 (D. Md. 2019) .........................................2, 6, 7, 8

*Nat'l Coal. for Students with Disabilities Educ. & Legal Def. Fund v. Allen*,
   152 F.3d 283 (4th Cir. 1998) ..................................................................................................3

*Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320 (N.D. Ga. 2016).................................................8

*Project Vote v. Long*, 682 F.3d 331 (4th Cir. 2012) .........................................................3, 4, 7, 8

*Pub. Interest. Legal Found. v. Bellows*, 92 F.4th 36 (1st Cir. 2024) ....................................4, 7, 11

*Pub. Interest Legal Found. v. N.C. State Bd. of Elections*, 996 F.3d 257 (4th Cir. 2021)..............7

**Statutes**

5 U.S.C. § 552..................................................................................................................................1

52 U.S.C. § 20507............................................................................................................... *passim*

52 U.S.C. § 21083 ..................................................................................................9

O.C.G.A. § 50-18-72 ..............................................................................................8

**Regulations**

COMAR 33.03.02.01B .........................................................................................11

**Other Authorities**

DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL
   CONSTITUTION (Jonathan Elliot ed., 1836) ..................................................10

Merriam Webster's Collegiate Dictionary (11th ed. 2008) ....................................8

*New Judicial Watch Study Finds 353 U.S. Counties in 29 States with Voter Registration Rates
   Exceeding 100%*, Judicial Watch, October 16, 2020 ...................................5

Pew Center on the States, Election Initiatives Issue Brief (Feb. 2012) .................5

THE FEDERALIST No. 59 (C. Rossiter ed. 1961) ..............................................10

U.S. Postal Service, Office of Inspector Gen., MS-MA-15-006, Strategies for Reducing
   Undeliverable as Addressed Mail 15 (2015) ...............................................9

## IDENTITY AND INTERESTS OF THE *AMICUS CURIAE*[1]

Judicial Watch, Inc. is a non-partisan, public interest organization headquartered in Washington, DC.  Founded in 1994, Judicial Watch seeks to promote accountability, transparency and integrity in government and fidelity to the rule of law. In furtherance of these goals, Judicial Watch monitors and investigates government and other agencies nationwide through public records laws, such as the Freedom of Information Act, 5 U.S.C. § 552, and the public inspection provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20507(i).

In 2012, Judicial Watch began its election integrity work, primarily enforcing the integrity provisions of the NVRA through the NVRA's private right of action. Since that time, Judicial Watch has obtained numerous state and county settlement agreements or consent decrees that brought jurisdictions from California to Kentucky to New York further into compliance with Section 8 of the NVRA. *See, e.g., Judicial Watch v. Grimes*, No. 17-94 (E.D. Ky. 2017) (ECF No. 39) (Consent Decree entered against the Commonwealth of Kentucky to enforce the NVRA); *Judicial Watch v. Logan*, No. 17-8948 (C.D. Cal. 2017) (settlement with Los Angeles County and the State of California to settle alleged NVRA violations); *Judicial Watch v. Griswold*, No. 20-2992 (Colorado NVRA settlement); *Judicial Watch v. Pennsylvania Sec. of State*, No. 20-708 (M.D. Pa. 2020) (Pennsylvania NVRA settlement).

In the last ten years, no public or private organization has obtained more statewide settlement agreements or consent decrees against chief state election officials for violations of the NVRA. As part of its list maintenance enforcement efforts, Judicial Watch also routinely requests

---

[1]     Judicial Watch states that no counsel for a party to this case authored this brief in whole or in part; and no person or entity, other than *amicus curiae* and its counsel, made a monetary contribution intended to fund the preparation and submission of this brief. All parties either consented to or did not oppose the filing of this brief.

public records of voter registration activities in various states under Section 8(i) of the NVRA, and has sued on its own behalf and on behalf of others to enforce it. *Judicial Watch v. Lamone*, 399 F. Supp. 3d 425 (D. Md. 2019); *Illinois Conservative Union v. Illinois*, 2021 U.S. Dist. LEXIS 102543 (N.D. Ill. June 1, 2021).

In Judicial Watch's NVRA requests, the statewide voter registration list is almost always the first record requested, with fields including the voter's name, address, date of birth, voter status, and the last five years of voting history. Judicial Watch uses the records obtained through the public inspection provision of the NVRA, along with data from the Election Assistance Commission and the U.S. Census Bureau, to determine whether state governmental officials are in compliance with the NVRA. This is information is critical to our pre-suit evaluation of whether a jurisdiction is potentially violating the NVRA's list maintenance requirements and whether there is a meritorious claim. "Organizations such as Judicial Watch … have the resources and expertise that few individuals can marshal. By excluding these organizations from access to the voter registration lists, the State law undermines Section 8(i)'s efficacy." *Judicial Watch*, 399 F. Supp. 3d at 445. Adopting Defendants' position that voter history is not a "record" subject to disclosure under the NVRA (*see* ECF 19-1 at 17-21) would substantially frustrate Judicial Watch's efforts to determine the accuracy of the registration list and ensure that jurisdictions in Maryland are complying with the list maintenance provisions of the NVRA, thereby undermining the purpose of the public disclosure provision.

For the foregoing reasons, Judicial Watch respectfully requests that this Court deny Defendants' motion to dismiss.

## SUMMARY OF ARGUMENT

The public disclosure provision of the NVRA embodies Congress' intent that Americans' right to vote "must not be sacrificed to administrative chicanery, oversights, or inefficiencies." *Project Vote v. Long*, 682 F.3d 331, 335 (4th Cir. 2012). The NVRA's public disclosure provisions mandates that "State officials labor under a duty of accountability to the public in ensuring that voter lists include eligible voters and exclude ineligible ones in the most accurate manner possible." *Id.* at 339. "Without such transparency, public confidence in the essential workings of democracy will suffer." *Id.* "[P]ublic confidence in the integrity of the electoral process has independent significance, because it encourage[s] citizen participation in the democratic process." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 197 (2008).

The NVRA provides an avenue for citizens to verify and ensure that only eligible registrants remain on the voter rolls by mandating public disclosure of *all* records concerning the accuracy of the official list of eligible voters. 52 U.S.C. § 20507(i)(1) (emphasis added). Congress' use of the word "all" as a modifier "suggests an expansive meaning because 'all' is a term of great breadth." *Project Vote*, 682 F.3d at 336 (quoting *Nat'l Coal. for Students with Disabilities Educ. & Legal Def. Fund v. Allen*, 152 F.3d 283, 290 (4th Cir. 1998)).

Voting history is clearly a "record" that "concerns" the accuracy and currency of the official lists of eligible voters. Judicial Watch routinely requests voting history as part of its program to monitor the lists and ensure that jurisdictions are complying with the NVRA's removal process to identify and remove registrants who have either moved or passed away. The NVRA requires jurisdictions to remove a registrant that has failed to respond to a confirmation mailing and failed to vote for two consecutive federal elections. It also requires the registrant's information to be updated should a registrant appear to vote after receipt of the confirmation mailing. That is

why voting history for at least the last two general federal elections is critical to determining whether the voter registration list is accurate and current. It is also why Judicial Watch requests these records as part of any NVRA public records request.

Restricting use of voting history and the voter registration list for any "investigation," including any related investigations into the accuracy of the official list of eligible voters in Maryland, undermines the efficacy and undermines the purposes of the NVRA. Defendants' argument that these regulations are consistent with the NVRA has been squarely rejected by the First Circuit, in a challenge to Maine's law that was less restrictive than the one at issue here. *Pub. Interest Legal Found. v. Bellows*, 92 F.4th 36, 50-51 (1st Cir. 2024). By creating a procedural barrier for individuals and organizations seeking to ensure the accuracy of the list, Maryland's regulations create "administrative chicanery, oversights, or inefficiencies" that the NVRA's public disclosure provision was designed to prevent. *Project Vote*, 682 F.3d at 335. As such, the restriction on disclosure of the voter list and voting history related to investigations of the accuracy of the list frustrate the purposes of the NVRA and are preempted by it.

Prohibiting individuals such as Plaintiffs from receiving the full voter registration list is an obstacle to NVRA enforcement and violates the plain text of the NVRA. Moreover, it would frustrate Congress' intent behind the integrity provision of the NVRA. To Judicial Watch's knowledge, every single court presented with this issue has found the records are covered by the NVRA and the restrictions on the investigatory conduct are preempted by it.

Accordingly, this Court should deny Defendants' motion to dismiss.

## ARGUMENT

**I.      Voter History is Vital to Determining an Accurate and Current Voter List.**

"It has been estimated that 24 million voter registrations in the United States – about one in eight – are either invalid or significantly inaccurate." *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 760 (2018) (citing Pew Center on the States, Election Initiatives Issue Brief (Feb. 2012)). According to this same study, approximately "2.75 million people are said to be registered to vote in more than one State." *Id.* More recently in 2020, Judicial Watch compared the total registration statistics in a subset of states to the most recent U.S. Census Bureau's American Community Survey and found that 353 counties had more registered voters than voting-age citizens.[2] Inflated registration lists without any public accountability undermines confidence in the integrity of the electoral process.

The public inspection provision of the NVRA is designed to increase transparency and improve confidence in electoral administration, providing the public oversight of the procedures state and local officials use for identifying and removing ineligible voters without compromising the registrations of eligible ones. Records contained within the voter registration list, such as a voter's registration status (active or inactive), and the basis for that status, are critical in determining compliance with list maintenance laws. As part of any NVRA-mandated program or activity to remove ineligible voters for change of residence, for example, the NVRA requires jurisdictions to send a forwardable postage pre-paid confirmation card to the registrant's last known address. *Id.*, § 20507(d)(1)-(2). If the registrant fails to respond to the notice, or the notice is returned as undeliverable, then the registrant is marked "inactive." Inactive registrants are still

---

[2]      *See New Judicial Watch Study Finds 353 U.S. Counties in 29 States with Voter Registration Rates Exceeding 100%*, Judicial Watch, October 16, 2020, available at https://www.judicialwatch.org/new-jw-study-voter-registration/.

registered voters and may still vote on election day without the need to re-register. But if the inactive registrant fails to vote or otherwise update their voter registration for two federal elections, the inactive registration must be removed from the voter registration list. *Id.*, § 20507(d)(1)(B); *see also Husted*, 584 U.S. at 767 (finding that federal law under the notice and waiting period makes removal mandatory).

Judicial Watch often relies on voter history in order to form a basis for allegations of non-compliance with Section 8's list maintenance requirements. *See e.g., Judicial Watch v. North Carolina*, No. 20-cv-211 (W.D.N.C. 2020) ECF No. 1, ¶ 44 ("having inactive registrations that have not shown any voting activity for extended periods of time also indicates that a state or jurisdiction is not removing ineligible registrants as required by the NVRA."); *id.* at ¶ 55 (data in North Carolina "indicates that many of the inactive registrations in Mecklenburg and Guilford Counties have shown no voting activity for longer than the prescribed statutory waiting period of two general federal elections."). Courts have relied on these types of allegations as plausible evidence of a Section 8 violation of the NVRA. *Judicial Watch, Inc. v. Griswold*, 554 F. Supp. 3d 1091 (D. Colo. 2021) (finding that reliance on public records based for failure to respond to a confirmation mailing and failure to vote plausibly alleged an NVRA violation).

In its Section 8(i) lawsuit in *Lamone*, Judicial Watch requested voter activity for the Montgomery County, Maryland official registration list for this reason. Montgomery County, Maryland at the time had high registration rates, where total registration according to the Election Assistance Commission exceeded age eligible citizenry under the Census. 399 F. Supp. 3d at 430. If there were a significant number of registrations on the list that were continuously inactive for more than two federal elections, then that would be plausible evidence of an NVRA list maintenance violation. The Court ultimately found that the records requested by Judicial Watch,

6

including voting history, were covered under Section 8(i) and Maryland's restriction to registered voters frustrated the purposes of the NVRA and was preempted by it. *Id.* at 446.

The restrictions at issue here would effectively prohibit individuals and organizations from using voter history for purposes of investigating compliance with list maintenance laws in Maryland, which would frustrate the purposes of the public disclosure provision of the NVRA. In *Bellows*, the First Circuit confronted a less restrictive regulation as the one at issue here. There, Maine passed a law that prohibited use of the voter registration list for any purposes that is not directly related to evaluating the State's compliance with list maintenance laws. 92 F.4th at 50. The First Circuit held Maine's law preempted by the NVRA since the plain language would prohibit organizations "from using the Voter File to evaluate another state's compliance with its voter list maintenance obligations or from using the Voter file to enforce the NVRA when the basis for such action was the evaluation (via Maine's Voter File) of another state's voter list maintenance obligations." *Id.* at 54 (internal quotations omitted). The restrictions imposed an "impenetrable barrier for those seeking to use the Voter File to evaluate and enforce compliance with the NVRA nationwide." *Id.*

## II.   Voting History is a "Record" Concerning the Accuracy of the Official List of Voters and Subject to Disclosure Under the NVRA.

Courts have uniformly held that the public disclosure provision of the NVRA is "broad." Congress' "use of the word 'all' [as a modifier] suggests an expansive meaning because 'all' is a term of great breadth." *Project Vote*, 682 F.3d at 336 (citation and internal quotations omitted). The expansive statutory language mandating disclosure is subject only to voter records containing "uniquely sensitive information." *Public Interest Legal Found. v. N.C. State Bd. of Elections*, 996 F.3d 257, 265 (4th Cir. 2021) (finding Social Security Numbers of voter registration applicants may be the type of uniquely sensitive information that may be withheld (citing *Project Vote*, 682

F.3d at 339)). In determining whether a record is the type of uniquely sensitive information that is proper for withholding, courts will look to explicit privacy protections afforded in federal and state law. *See Lamone*, 455 F. Supp. 3d at 223-24 (citing *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1344 (N.D. Ga. 2016). In Georgia, for instance, state public records law mandated the withholding of certain information related to the voter's date of birth, which the court found persuasive in withholding birthdate information from a Section 8(i) request. *See Kemp*, 208 F. Supp. 3d at 1345 (citing O.C.G.A. § 50-18-72(a)(20)(A)). Maryland, by contrast, had no such requirement, and the court there ordered the release of the records under Section 8(i). *Lamone*, 455 F. Supp. 3d at 224.

Defendants do not argue that voter history is "uniquely sensitive" voting record that may be withheld. Rather, Defendants argue that voting history somehow falls outside the scope of Section 8(i)'s broad reach. This is wrong for several reasons. First, this Court in *Lamone* squarely rejected this reasoning. *Id.* at 442. Second, the plain language of the statutory terms clearly compel disclosure of voting history. Similar to "all," Congress' use of "concerning" is a similarly broad term. *See* Merriam Webster's Collegiate Dictionary (11th ed. 2008) ("Concern" includes "relate to," "be about," "bear on," "have an influence on," "INVOLVE"); *Bloomberg L.P. v. United States FDA*, 500 F. Supp. 2d 371, 377 n.3 (S.D.N.Y. 2007) (Local Rules define "concerning" as "relating to, referring to, describing, evidencing, or constituting"). In ordinary speech, records within the voter registration list (*e.g.*, name, address, date of birth, voting status, and voting history), "concern" – that is, they "relate to," "bear on," "influence," "involve," and "evidence" – all of the programs and activities that keep them up to date. Surely, a statute calling for disclosure of "all records concerning" programs and activities to keep the lists current includes the records normally contained within the voter registration list. The primary records bearing on NVRA-mandated

removal programs and activities to ensure the accuracy and currency of voter lists must be the voter data itself.

Voting history clearly "concerns" the accuracy and currency of the official list of eligible voters. As stated *supra*, Part I., it is necessary to determine whether inactive registrations are being timely removed from the voter registration list after the second general federal election of no voting activity. But voting history is also vital to determining the accuracy and currency of the official list of voters for *active* registrations. Many states and jurisdictions use lack of voting activity for *active* registrations as a precondition to determining whether those registrants have moved or died. Ohio, for example, has a "supplemental process" where the state sends confirmation mailings to voters who lack voting activity for a certain period of time. *See Husted*, 584 U.S. at 765. Other states have similar processes. *See id.* at 763 (collecting state statutes). Presumably, the states initiate this supplemental process because reliance on the NVRA's safe-harbor of using the National Change of Address Database to start the confirmation removal process was insufficient as "many as 40 percent of people who move do not inform the Postal Service." *Id.* at 765 (citing U.S. Postal Service, Office of Inspector Gen., MS-MA-15-006, Strategies for Reducing Undeliverable as Addressed Mail 15 (2015)).[3] Lack of voting activity may also be strong circumstantial evidence that exceedingly old active registered voters may have passed away.

III.   **Defendants' Investigatory Restrictions on the Use of Voter is Superseded and Preempted by the NVRA's Public Disclosure Provision.**

Congress passed the NVRA pursuant to its inherent congressional powers under the Elections Clause. *See Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8 (2013). "The

---

[3]   Voting activity could also guard against the improper removal of active registrants. The Help America Vote Act explicitly mandates that states shall not remove a registrant *solely* by reason of the registrant's failure to vote. *See* 52 U.S.C. § 21083(a)(4)(A).

dominant purpose of the Elections Clause, the historical record bears out, was to empower Congress to override state election rules, not to restrict the way States enact legislation." *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n.*, 576 U.S. 787, 814-15 (2015). The grant of complete Congressional power over the timing of federal elections "was the Framers' insurance against the possibility that a State would refuse to provide for the election of representatives to the Federal Congress." *Arizona*, 570 U.S. at 8; *see also* THE FEDERALIST No. 59, at 362-63 (C. Rossiter ed. 1961) (A. Hamilton) (providing exclusive authority in state legislatures "would leave the existence of the Union entirely at their mercy. They could at any moment annihilate it by neglecting to provide for the choice of persons to administer its affairs"). The solution was the Elections Clause, which "enables Congress to alter such regulations as the states shall have made with respect to elections." DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 68 (Jonathan Elliot ed., 1836).

The "power of Congress over the 'Times, Places and Manner' of congressional elections 'is paramount, and may be exercised at ay time, and to any extent which it deems expedient; and so far as it is exercised, and no farther, the regulations effected supersede those of the State which are inconsistent therewith." *Arizona*, 570 U.S. at 9 (quoting *Ex parte Siebold*, 100 U.S. 371, 392 (1880)). The power is unique from other congressional powers since "*all* action under the Elections Clause displaces some element of a pre-existing state regulatory regime." *Id.* at 14 n.6. Accordingly, the Elections Clause gives Congress "plenary authority over federal elections," "explicitly ensur[ing] that all conflicts with similar state laws would be resolved wholly in favor of the national government." *Harkless v. Brunner*, 545 F.3d 445, 454 (6th Cir. 2008); *see Foster v. Love*, 522 U.S. 67, 69 (1997) (Elections Clause "invests the States with responsibility for the mechanics of congressional elections . . . but only so far as Congress declines to pre-empt state

10

legislative choices") (citations omitted); *ACORN v. Edgar*, 56 F.3d 791, 794 (7th Cir. 1995) (unlike most constitutional provisions that tell states "what they can or cannot do," the Elections Clause provides "that Congress can if it wants step in and either make its own regulations or alter those adopted by the state . . . Congress was given the whip hand").

Defendants' Use Restriction at issue here interferes with this expansive congressional power when Congress enacted a broad public disclosure provision under the NVRA. Moreover, the claimed state authority for such Use Restriction was "necessarily displaced" after the enactment of NVRA. *See Arizona*, 570 U.S. at 14. The broad prohibition on the use of voter data, including voter history, for any "investigations" into "an illegal or suspected illegal infraction or violation involving the voter's behavior in a specific election" under COMAR 33.03.02.01B(1)(c) restricts any individual or organization ability to monitor the accuracy and currency of the official list of eligible voters in Maryland. Any "restrictions imposed by" a state law that "erect[s] an impenetrable barrier for those seeking to use the Voter File to evaluate and enforce compliance with the NVRA" is preempted by the NVRA. *See Bellows*, 92 F.4th at 54.

**CONCLUSION**

For all these reasons, the Court should deny Defendants' motion to dismiss.

Dated: April 5, 2024                          Respectfully submitted,

| | |
|---|---|
| T. Russell Nobile<br>**JUDICIAL WATCH, INC.**<br>P.O. Box 6592<br>Gulfport, Mississippi 39506<br>Rnobile@judicialwatch.org | *s/ Eric W. Lee*<br>Eric W. Lee (No. 20073)<br>Robert D. Popper<br>**JUDICIAL WATCH, INC.**<br>425 Third Street, SW<br>Washington, DC 20024<br>(202) 646-5172<br>elee@judicialwatch.org<br>rpopper@judicialwatch.org<br><br>*Attorneys for Amicus Curiae* |