**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| KATHERINE SULLIVAN, *et al.,*<br><br>Plaintiffs,<br><br>v.<br><br>MICHAEL G. SUMMERS, *et al.,*<br><br>Defendants. | No. 1:24-cv-00172-MJM |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 105(1), Plaintiffs Katherine Strauch Sullivan and David Morsberger respectfully submit this memorandum in support of their motion for summary judgment.[1]

**INTRODUCTION**

The material facts in this case are undisputed. Plaintiffs have requested voter registration lists, including voter history records, from the State Board of Elections ("SBE"), to investigate the accuracy and currency of that information by voluntary door-to-door canvassing. The SBE refused to produce those records because Plaintiffs declined to attest that they would not use them in conjunction with any "investigations," including those "into an illegal or suspected illegal infraction or violation involving the voter's behavior in a specific election." S*ee* COMAR 33.03.02.01B(1)(c), 33.03.02.04A (the "Use Restriction"). Plaintiffs filed this case because the National Voter Registration Act of 1993, 52 U.S.C. § 20501, *et seq.* ("NVRA") prevents the SBE from enforcing the Use Restriction.

The legal issues in this case are straightforward. First, the NVRA compels SBE to produce voter registration lists, including voter history records, to the public. 52 U.S.C. § 20507(i). These records are not exempt from this production requirement. Second, the Use Restriction restricts the use of those records to engage in otherwise lawful (e.g., non-harassing, non-threatening) conduct intended to "assist the identification of both error and fraud in the preparation and maintenance of voter rolls," *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 339 (4th Cir. 2012), which is Section 8(i)'s primary purpose.

Together, these two conclusions establish that the NVRA preempts the Use Restriction. The Use Restriction applies to records governed by the NVRA and it inhibits citizen oversight of

---

[1] Summary judgment in Plaintiffs' favor on either count likely moots the remaining claim.

1

the accuracy and currency of the state's voter registration list.  Other courts have invalidated use restrictions like Maryland's because they "erect an impenetrable barrier for those seeking to use [registration lists] to evaluate and enforce compliance with the NVRA," specifically its command that states maintain "accurate and current voter registration rolls." *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 54 (1st Cir. 2024).  There is no indication in the NVRA's text, its history, or the case law that Congress left room for States to prevent citizens from accessing and using voter registration lists to conduct wholly voluntary canvassing activities. The Use Restriction thus obstructs the purpose of—and hence is preempted by—Section 8(i) of the NVRA.

Further, because the Use Restriction, as interpreted by the SBE, predicates the permissibility of investigatory canvassing using the voter list on the purpose and perspective of the canvasser, it is viewpoint discriminatory, in violation of the First and Fourteenth Amendments.

## STANDARD OF REVIEW

A party is entitled to summary judgment in its favor if it "shows there is no genuine dispute as to any material fact and the [party] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Tekmen v. Reliance Std. Life Ins. Co.*, 55 F.4th 951, 958 (4th Cir. 2022).   The parties have stipulated to the relevant facts, and summary judgment is appropriate to resolve disagreements over the law.  *See United States v. West Virginia*, 339 F.3d 212, 214 (4th Cir. 2003) ("Because this dispute ultimately turns entirely on a question of statutory interpretation, the district court properly proceeded to resolve the case on summary judgment.").

**ARGUMENT**

I. **The NVRA Entitles Plaintiffs to Use the Voter Registration List, Including Voter History, to Engage in Voluntary Canvassing When Investigating Potential Legal Infractions Relating to the Registration Rolls**

The NVRA preempts the Use Restriction because it prohibits canvassing voters to help assess the accuracy and currency of the state's voter registrations. Maryland law conditions access to the voter registration list, including voter history, on the requestor's sworn promise not to use the information it contains for a "commercial solicitation" or "any other purpose not related to the electoral process." Md. Law Election § 3-506(a)(1)(ii). Because their canvassing fits comfortably within a reasonable definition of "electoral purposes," Plaintiffs do not challenge these statutory strictures, and do not use voter registration data for commercial purposes. *See* Joint Statement of Facts ("JSOF") ¶ 17. In June 2023, the SBE adopted the Use Restriction, which provides that the term "electoral process" "does not include investigations" and that the "use of a voter registration list to contact an individual voter as part of an investigation into an illegal or suspected illegal infraction or violation involving the voter's behavior in a specific election is not a 'purpose . . . related to the electoral process.'" COMAR 33.03.02.01B(1)(c). Using a voter list for a purpose not related to the Use Restriction's definition of electoral process (or knowingly transferring it to someone else for that purpose) is a misdemeanor. *See* Md. Election Law § 3-506(c).

By excluding from the definitional ambit of "electoral process" any "contact" with a voter "as part of an investigation into an illegal or suspected illegal infraction or violation involving the voter's behavior in a specific election," the Use Restriction impedes the effectuation of federal policy. *See Project Vote*, 682 F.3d at 339; *Voter Reference Found., LLC v. Torrez*, No. CIV 22-0222-JB/KK, 2024 WL 1347204, at *142 (D.N.M. Mar. 29, 2024) (noting that a "State regulation" or even "a non-binding legal interpretation may be subject to preemption analysis" under the

3

NVRA). The NVRA guarantees public access to virtually "all records" generated or utilized in the maintenance of voter rolls, 52 U.S.C. § 20507(i)(1), and authorizes the use of such records "to protect the integrity of the electoral process" or "to ensure that accurate and current voter registration rolls are maintained," § 20501(b)(3)-(4). Because the undisputed facts confirm that the Plaintiffs employ the voter registration list for precisely such ends when conducting their investigatory canvassing, the NVRA preempts the Use Restriction.

> **A.  Section 8(i) Requires States to Allow the Public to Use Voter History Records to Assess the Accuracy and Currency of their Voter Registration Lists**

Defendants have sought summary judgment by arguing that the Use Restriction applies only to voter history records, which they say fall outside the production requirements of the NVRA's Section 8(i)(1). *See* ECF No. 19-1 at 15-16. This is wrong. Defendants' "narrow construction of Section 8(i)(1) overlooks the sweeping language that Congress adopted, which makes 'all records concerning the implementation of' [Maryland's] voter list registration and maintenance activities subject to disclosure." *Bellows*, 92 F.4th at 48. Voter history records fit comfortably within that definition. In fact, it is *impossible* to comply with the NVRA's list maintenance obligations without voter history records. Maryland's own laws confirm this otherwise irrefutable point. *See* Md. Election Law § 3-101(b)(6) (defining "statewide voter registration list" to "include voting history information on a current basis for a period covering at least the 5 preceding years"); COMAR 33.03.02.03B(2) (allowing applicants to request "voter history" as part of the "voter registration list").[2]

---

[2] Defendants muddy the waters by distinguishing MDVOTERS, Maryland's voter registration list mandated by HAVA, *see infra* at 5, and the voter registration lists Defendants provide to requesters and, secondly, the mechanics by which officials extract information such as voter history from MDVOTERS to produce the registration lists. ECF 19-1 at 11-13. Both points are entirely irrelevant. The registration list, including "voter participation history," is simply an "output" or

The collection and use of accurate and current voter history information is a federally mandated facet of "programs and activities" necessary to maintain the voter registration rolls. Specifically, if a registrar obtains information indicating that a voter has moved out of state and fails to respond to a written request that she either confirm her residence location or update her voter registration, she must be placed in inactive status. If the voter does not either vote in any election over the next ensuing two federal election cycles or updates her registration during that period, her registration must be canceled, but if she does either, her registration may not be canceled. *See* 52 U.S.C. §§ 20507(d), 21083(a)(4)(A); *see also* Md. Election Law § 3-503(c) ("An inactive voter who fails to vote in an election in the period ending with the second general election shall be removed from the statewide voter registration list.").[3]

The Help America Vote Act of 2002, 52 U.S.C. § 21081, *et seq.* ("HAVA"), likewise requires States to create and administer "a single, uniform, official, centralized, interactive computerized statewide voter registration list." § 21083(a)(1)(A); *see also Bellows*, 92 F.4th at 45 (emphasizing states' obligation under HAVA "to conduct activities for the purpose of ensuring the accuracy and currency of the state's official lists of eligible voters"). This statewide voter registration list, known in Maryland as MDVOTERS, must be maintained in conformance with the NVRA, to include tracking the voter history of inactive voters and, as appropriate, eventually canceling their registrations. *See id.* § 21083(a)(2)(A), (a)(4)(A); *see also* JSOF ¶ 5. In other words, because a voter's active or inactive status—and possible eventual registration

---

"an electronic report generated from" MDVOTERS, "the database through which [Maryland] carries out its voter registration and maintenance activities" "and is thereby subject to disclosure under Section 8(i)(1)." *Bellows*, 92 F.4th at 47 (describing Maine's similar recordkeeping and list production system).

[3] Indeed, records reflecting notices sent to voters who appear to have changed their residence to a location outside the jurisdiction—a predicate for a potential redesignation as an inactive voter—are among those documents to which the public is guaranteed access. *See* 52 U.S.C. § 20507(i)(2).

cancelation—are both premised in part on his voting history, this facet of the registration list "contain[s] . . . information on which Maryland election officials rely to monitor, track, and determine voter eligibility." *Judicial Watch, Inc. v. Lamone*, 399 F. Supp. 3d 425, 439 (D. Md. 2019) ["*Lamone I*"]. It hence concerns list maintenance "programs and activities."

Section 8(i)'s plain text confirms this basic point. "'[T]he starting point for any issue of statutory interpretation . . . is the language of the statute itself.'" *Redeemed Christian Church of God v. Prince George's Cnty.*, 17 F.4th 497, 508 (4th Cir. 2021). Section 8(i) mandates that States make available to the general public "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1).[4] The adjective "all" and the preposition "concerning" collectively evoke an expansive sweep. *See Project Vote*, 682 F.3d at 336; *Bellows*, 92 F.4th at 47 (noting that "the term 'concerning' . . . ensur[es] that the scope of a provision covers not only its subject but also matters <u>relating to</u> that subject" (citations and quotations omitted)); *see also Pub. Int. Legal Found. v. Boockvar*, 431 F. Supp. 3d 553, 561 (M.D. Pa. 2019); *Pub. Int. Legal Found. v. Matthews*, 589 F. Supp. 3d 932, 941 (C.D. Ill. 2022). Accordingly, a document or data that has any nexus to voter list maintenance "programs and activities" is within Section 8(i)'s scope.

Recognizing that voter history data is assimilated into the NVRA's and HAVA's list maintenance infrastructure, at least three jurisdictions have explicitly agreed that Section 8(i) secures access to voter history records, *see Bellows*, 92 F.4th at 47; *Voter Reference*, 2024 WL 1347204, at *139; *Pub. Int. Legal Found. v. Chapman*, 595 F. Supp. 3d 296, 307 (M.D. Pa. 2022).

---

[4] That Section 8(i) exempts only two discrete categories of documents—namely, those relating to a "declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered"—implicitly illuminates its broad ambit. *See Voter Reference Found.*, 2024 WL 1347204, at *138 (observing that "the listing of the specific exceptions to disclosures under [Section 8(i)] reenforces the Court's conclusion that the statute is otherwise inclusive").

This Court also appears to have impliedly endorsed the same proposition, or at least its underlying rationale. *See Lamone I*, 339 F. Supp. 3d at 442 (holding that Maryland's voter registration list is covered by Section 8(i), although not specifically addressing voter history).[5] Plaintiffs are not aware of any case to have reached a contrary conclusion. Nor have Defendants ever cited one.

Scrambling to deflect scrutiny of their statutorily and logically untenable effort to disassemble the unitary statewide voter registration list, the Defendants fret that confirming voter history's inclusion within Section 8(i)'s scope portends the ostensibly "absurd" disclosure of death records and health-related information. *See* ECF No. 29 at 4. Putting aside that such records are not at issue in this case, the Defendants' argument dissipates under scrutiny. Most attributes of death records—*e.g.*, the decedent's name, date of death, etc.—are not "private" at all, and reveal little more than a newspaper obituary. And because the NVRA requires States to "conduct a general program" to identify and remove deceased voters from the rolls, 52 U.S.C. § 20507(a)(4)(A), records concerning voter deaths likely are, in fact, encompassed by Section 8(i). *See Pub. Int. Legal Found, Inc. v. Dahlstrom*, 673 F. Supp. 3d 1004, 1012-14 (D. Alaska 2023) (complaint seeking deceased voter reports stated valid claim under Section 8(i)). And if the hypothetical case the Defendants imagine ever arose, a "court can order redaction of 'uniquely sensitive information' in otherwise disclosable documents." *Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 267 (4th Cir. 2021).

In short, voter history data not only can but ***must*** be utilized in certain circumstances when evaluating a voter's continued eligibility to remain on the rolls. It accordingly is "a record concerning the implementation of [list maintenance] programs and activities" under Section 8(i).

---

[5] *Amicus curiae* Judicial Watch, the plaintiff in *Lamone I*, has opined that the court's ruling effectively validated Judicial Watch's request, which encompassed the voter history component of the voter registration list. *See* ECF No. 25-1 at 6-7.

### B. The Use Restriction Prevents Canvassing to Assess the Accuracy and Currency of the Registration List, and Hence Obstructs the Very Purpose of Section 8(i) to Facilitate Public Oversight of the Voter Rolls

By prohibiting Plaintiffs from conducting voluntary direct canvassing designed to assess the accuracy and currency of the voter registration rolls, the Use Restriction obstructs the NVRA's express purposes, and thus is preempted. A state law or regulation is "preempted as in 'conflict' with federal law when it 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Va. Uranium, Inc. v. Warren*, 848 F.3d 590, 594 (4th Cir. 2017). Because States do not possess any inherent, pre-Founding authority to regulate *federal* elections, congressional enactments in this domain, such as the NVRA, are not governed by the customary presumption against preemption. *See Lamone I*, 399 F. Supp. 3d at 444 ("[T]he 'assumption that Congress is reluctant to pre-empt does not hold when Congress acts' under" the Elections Clause in Article I, § 4). The preemptive force of the NVRA is thus beyond question.

The Court need not surmise Congress' motivations for adopting the NVRA; it stated them explicitly. In securing an expansive right of access to records concerning the voter rolls, *see* 52 U.S.C. § 20507(i), Congress intended "to protect the integrity of the electoral process" and "to ensure that *accurate and current* voter registration rolls are maintained," *id.* § 20501(b)(3)-(4) (emphasis added). While the responsibility of confining the franchise only to eligible individuals resides ultimately with officials, Congress recognized that private citizens can infuse added rigor into this work by both monitoring officials' list maintenance functions and serving as a supplemental source of information. If state or local officials fail to "make[] a reasonable effort to remove the names of [certain] ineligible voters from the official lists," § 20507(a)(4), citizens can procure corrective actions in the courts, *see id.* § 20510. Stated another way, Congress

8

understood that the disclosures facilitated by Section 8(i) would "assist the identification of both error and fraud in the preparation and maintenance of voter rolls." *Project Vote*, 682 F.3d at 339.

And, of course, the mere passive receipt or inert viewing of registration records does not—and cannot—effectuate the NVRA's policy aspirations. Citizens must be able to "use" the records to which the NVRA grants them access for list-maintenance purposes. This right, moreover, is not only implicit in, but integral to, the NVRA. *See Bellows*, 92 F.4th at 54 (disclosure "is necessary if members of the public . . . are ever to identify, address, and fix irregularities in states' voter rolls by exercising their private right of action under the NVRA"); *Voter Reference*, 2024 WL 1347204, at *142 ("[I]t would be anomalous if Congress would seek to guarantee only 'access' to data, without also ensuring the 'use' of such data to be shared among the public").

Here, Plaintiffs use the Maryland voter registration list as the basis for investigations into its accuracy and currency. Specifically, they employ statistical methods to develop samples of voters to canvass (without regard to those voters' actual or assumed partisan or candidate preferences). They then directly contact several hundred of these individuals and, on a wholly voluntary basis, ask them questions to verify identifying information and to elicit information about their voting history (*e.g.*, method of voting or polling location) in the preceding election. *See* JSOF ¶¶ 27-28, 32. Plaintiffs have used the data collected through these canvassing efforts to identify potential inconsistencies or anomalies in the voter registration list, which they have presented to election officials in written reports and other presentations. *Id.* ¶¶ 30, 37. For example, Plaintiffs' use of voter history records in conjunction with their canvassing has yielded findings of potentially duplicate registrations and voters with questionable inactive status and inaccurate voter history. JSOF, Exhibit A at p. 4, 7, 9.

The Use Restriction runs afoul of the NVRA because it thwarts these efforts. On its face,

the Use Restriction categorically precludes all "investigations" from the definition of "electoral process." It thereby forbids use of the registration list for any such purpose, including those that evaluate its accuracy and currency. Because such efforts are the lodestar of Section 8(i), the NVRA plainly preempts the use restriction's ban on "investigations." *See Judicial Watch, Inc. v. Lamone*, 455 F. Supp. 3d 209, 225 (D. Md. 2020) ["*Lamone II*"] (NVRA protects use of voter birthdates to identify possible duplicate registrations and deceased voters); *Bellows*, 92 F.4th at 53-54; *Voter Reference*, 2024 WL 1347204, at *143 (NVRA provides a right to access records, as well as "a right to use those records in a manner that accords with the NVRA's objectives").

Defendants' efforts to narrow the scope of their own regulation does not help their cause. As they put it, the Use Restriction's broad scope is somehow cabined by its second, independent, sentence, which forbids face-to-face canvassing to investigate "an illegal or suspected infraction or violation involving the voter's behavior in a specific election." As Plaintiffs have already explained, this effort is improper. ECF No. 22 at 16. But in any event, it does nothing to save the Use Restriction. The collection and analysis of past voting behavior is highly relevant to assess the accuracy and currency of the state's voter registration list. For example, Plaintiffs' canvassing yielded instances in which voters' own accounts of their voting history were inconsistent with voting history data in the voter list, and revealed other potential inaccuracies in voter list entries associated with the canvassed voter. *See* JSOF, Ex. A at pp. 2-3. Further, all of this is true regardless of the canvassers' motivations with respect to "illegal or suspected infraction[s] or violation[s]." COMAR 33.03.02.01B(1)(c).

And this only highlights another pernicious aspect of the Use Restriction. It puts canvassers in criminal jeopardy should they happen to discover any infractions or violations while working to assess the accuracy and currency of the voter registration list. As shown, "infractions and

10

violations" will overlap with inaccuracies and lack of currency in the voter registration list. Indeed, a canvasser who reports evidence of inaccuracies or lack of currency may have no way of knowing whether those issues are traceable to any "infraction" or "violation"—whether by the canvassed voter, an election official, or a third party. Restrictions that chill work in furtherance of accurate and current voter registration lists in this way are impermissible obstacles to the ability of the NVRA to achieve one of its core purposes.[6]

At least four attributes of Section 8(i) establish that the Use Restriction falls comfortably within its preemptive scope. First, whether an inaccuracy or lack of currency in the voter rolls is traceable to an inadvertent error or an "infraction" or "violation" of some law is immaterial. *See Project Vote*, 682 F.3d at 339 (NVRA was intended to facilitate discovery of "both error and fraud" in the rolls). The NVRA preempts state laws that stand as an obstacle to the discovery of inaccuracies or lack of currency traceable to either source. Second, the actual or perceived efficacy of a citizen's list maintenance inquiries is likewise irrelevant. *See Lamone II*, 455 F. Supp. 3d at 225. In other words, it does not matter if states think canvassing is a good idea or a bad idea or if it identifies many problems with the voter registration list or none at all. All that is required is a rational relationship between the conduct and the quality of the voter registration list. Third, it does not matter if the conduct in question could produce undesirable outcomes. That is why the NVRA preempts restrictions on the public posting of voter registration lists because, notwithstanding privacy concerns, such "dissemination . . . is necessary if members of the public . . . are ever to identify, address, and fix irregularities in states' voter rolls…." *Bellows*, 92 F.4th at 54. The state may not protect against such consequences by regulating the use of the list. Rather,

---

[6] As discussed at length in the Plaintiffs' response to the motion to dismiss, non-voter history components of the voter registration list also can be used in the voluntary, investigatory canvassing that the Use Restriction forbids. *See* ECF No. 22 at 9-11.

it must do so directly, by, for example, prohibiting trespass or harassing or threatening behavior. *Id.* And fourth, the NVRA's preemptive ambit encompasses all matters of voter registration and voter list maintenance, while placing beyond its reach other facets of election administration, such as the operation of polling places or ballot tabulation. *See True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 724-29 (S.D. Miss. 2014). The Use Restriction addresses the voter registration list, including voter history. It is thus well within the reach of the NVRA's preemptive scope.

In sum, the Use Restriction prevents Plaintiffs from using any component of the voter registration list to engage in canvassing that surveys voters' "behavior," if there may be a nexus to some "infraction or violation" relating to registration laws. This prohibition obstructs the NVRA's express purpose of enabling citizens to investigate and unearth potential "error and fraud in the preparation and maintenance of voter rolls." *Project Vote*, 682 F.3d at 339. The NVRA accordingly preempts the Use Restriction.

## II.   As Interpreted by the SBE, the Use Restriction Is Viewpoint Discriminatory

If (as Defendants now contend) the Use Restriction prohibits using the voter list for investigatory canvassing ***only if*** the investigation concerns "an illegal or suspected illegal infraction or violation involving the voter's behavior in a specific election," COMAR 33.03.02.01B(1)(c)—as distinguished from all "investigations"—it is facially viewpoint-discriminatory in violation of the First and Fourteenth Amendments. For the sake of efficiency, Plaintiffs incorporate by reference their arguments in their opposition to the Defendants' motion to dismiss with respect to this claim. *See* ECF No. 22, pp. 19-24.

## CONCLUSION

For the foregoing reasons, the Court should enter summary judgment in Plaintiffs' favor with respect to Count I and/or Count II of the Complaint.

12

Respectfully submitted this 30th day of August, 2024.

*/s/J. Justin Riemer*
J. Justin Riemer (No. 30943)
RIEMER LAW LLC
1125 West Street, Suite 200
Annapolis, MD 21401
Tel: (443) 266-2937
justin@riemer.law

Kory Langhofer (Ariz. Bar No. 024722)*
Thomas Basile (Ariz. Bar No. 031150)*
STATECRAFT PLLC
649 North Fourth Avenue, First Floor
Phoenix, Arizona 85003
Tel: (602) 382-4078
kory@statecraftlaw.com
tom@statecraftlaw.com
*Admitted *pro hac vice*

## CERTIFICATE OF SERVICE

I certify that, on this 30th day of August, 2024 the foregoing was served by CM/ECF on the following registered CMF users:

Daniel M. Kobrin
Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
dkobrin@oag.state.md.us

                                                               */s/ J. Justin Riemer*
                                                               J. Justin Riemer